Good morning, Your Honors, and may it please the Court, Brianna Burgos, Pro Bono Counsel on behalf of Petitioner Mr. Hugo Gonzalez Mejia, I respectfully request four minutes on rebuttal, Your Honors. Thank you. This case is before you because the BIA failed to consider relevant evidence regarding Mr. and ignored essential facts surrounding the threat against his life. A remand here is appropriate to ensure the BIA has assessed all relevant evidence and all facts before rendering a final determination. First, Mr. Gonzalez Mejia's conviction demonstrates that his crime should not have been categorized as particularly serious. Under Penal Code Section 245, Mr. Gonzalez Mejia, who pled no contest, was sentenced to two years. Under this penal code, an individual is sentenced to imprisonment for two, three, or four years. My client received the lowest possible sentence under the statute. Further— Why is that determinative, though? I mean, it could be the lowest, but it's still, you know, it could still be the lowest of a particularly—I mean, if he was convicted of murder and murder was, you know, 20 to 40 and he was sentenced to 20 years, we wouldn't say, oh, well, that's the low end. Right, Your Honor. This is one of several factors that the IJ and BIA must look at, so the nature of the conviction, the facts and circumstances surrounding the crime, the mental state of the individual. These all need to be assessed and factored in. So it's not just the conviction itself, but the conviction is a factor that helps and should guide the IJ and BIA in determining whether or not the underlying crime is particularly serious. And again, here, he received the lowest. And then further, the sentencing judge, who is the fact finder closest to the facts of the underlying crime, further reduced his sentence based on time in custody and good time and work served. So my client ended up serving around 11 months. Essentially, he served a sentence for a misdemeanor. This is critical context that the BIA did not consider. Second, the BIA and IJ failed to look at the nature and circumstances surrounding the crime itself. Instead, the IJ focused heavily on the underlying elements of the crime and provided substantial weight to the victim, a known gang member's version of events. First, it is inappropriate for the IJ and BIA to rely solely on the elements of a crime in assessing whether or not the crime is particularly serious. And second, the IJ and BIA cannot ignore a petitioner who's been found credible's version of events and favor that of testimony from a different witness. That alone is grounds for remand. And even though they found my client credible, they did not actually weigh his testimony. Because as he testified, he had been asleep when he awoke to the sounds of his nephew, who he considers to be his son, screaming. That version of events was described in the remand that it seems like the agency, the BIA didn't actually consider. Am I right? Correct. The BIA did not consider. But is there, what is your argument that the BIA had to consider that? The nature and the circumstances surrounding the crime. So first... Right, but there were two times this was before the BIA. Why couldn't the BIA just use the first time and not what happened between the first and second time it was before the BIA? The BIA could have considered it the first time as well. But even there, the BIA failed to. But at that point, this testimony about being asleep hadn't happened yet, right? Correct, Your Honor. Pardon me, I misspoke. The testimony about him being asleep had not been before the BIA, though he had been questioned about it, I believe, in front of the IJ. And even if the BIA had not had that information, the facts still demonstrate that the crime itself should not have been considered particularly serious because he came in defense of his nephew. And the BIA did have those facts and that information, that my client had stepped in after his nephew had been threatened by this gang member and then had called for his help. And importantly, as my client, who's credible, testified, he extricated himself and his nephew from the situation. And the BIA failed to consider those facts and circumstances. Say my client had been walking down the street and assaulted a random passerby. That would be completely different than the circumstances here. There it would be an unprovoked attack. Here, my client was in defense of his nephew, a very close family member who he considers to be his son. And the BIA's failure to consider all of these facts, these relevant facts, and this evidence also carries with it due process concerns. The BIA failed to weigh and assess the appropriate factors regarding the IJ's determination of a particular serious crime. Mr. Gonzales Mejia deserves a full and fair hearing where the BIA assesses and weighs all of the relevant factors. At a minimum, remand is appropriate to ensure that he's afforded due process. Turning to the cat claim. On the cat claim, the BIA and IJ had looked at the wrong evidence. Where my client's claim was based on a unique, particularized threat grounded in who he is and who his uncle is, the IJ and the BIA looked broadly at country conditions and determined that gay men in El Salvador are faring better now than they had a few years ago. But Mr. Gonzales Mejia does not face only a generalized threat. Mr. Gonzales Mejia would not just be a man in El Salvador under threat of MS-13. He would not even just be a gay man in El Salvador under threat of MS-13. He's a gay man, or he would be, a gay man in El Salvador marked by MS-13, specifically because his uncle, a leader, a shot caller of one of the most notorious gangs in the region, has been clear that he intends to kill his nephew if he ever steps foot in El Salvador. The BIA and IJ ignored a critical pattern in these threats. His uncle's threats correspond to whenever Mr. Gonzales Mejia might be back in El Salvador. His uncle is opportunistic, and his threats demonstrate a pattern that illustrates his desire to kill his nephew should he return to the country. That understanding of the record is certainly one understanding of the record, but it seems like the agency thought that the passage of time made a difference here, that maybe the, I don't know, implicitly that the uncle has calmed down or something. Why is that not, why is there not substantial evidence to support the idea that maybe the passage of time makes a difference? Because evidence in the record supports the opposite conclusion. The most recent time his uncle has asked about his nephew would be in 2018-2019, and that evidence was disregarded by the BIA and IJ. So the main threat came around 2011 or 2012. But his uncle essentially re-upped that threat by asking about what his nephew was doing, when he'll be back in the country. This is not a caring nephew just seeing when his nephew is going to come to visit, pardon me, a caring uncle wondering when his nephew is going to come to visit. This was an implicit threat. When is he within my grasp? When is he coming back to El Salvador? Is he going to be deported? That in and of itself was a threat, and that was a recent threat, 2018-2019, and it should have been afforded the weight and assessment it deserved as a threat. But again, the BIA and IJ did not, and instead only referenced the 2011 and 2000 threats, finding those to be the main operative threat. And importantly, there's no case law demonstrating that this particular circumstance would evince that the threat has passed. Instead, the threat was renewed in 2018-2019, around the time my client may or may not have been deported. Evincing that pattern I had mentioned previously, that he asks when he thinks that Mr. Gonzalez-Mejia will be back within his grasp. And even without that, the IJ and BIA still erred in its assessment of the country conditions, namely my client's ability to internally relocate. The burden is not on Mr. Gonzalez-Mejia to demonstrate that it would be impossible for him to relocate within El Salvador, and indeed, he presented a mountain of evidence demonstrating that MS-13 controls 94% of the country. The government acquiesces to acts of violence by MS-13. And specifically, that MS-13 and the Salvadoran government target the LGBT community within El Salvador. This all demonstrates that, though relocation is not impossible, it is going to be extremely difficult for him to be safe anywhere in El Salvador. And instead of acknowledging that very real threat, the IJ and BIA, they state that the country conditions seem to indicate it's getting better, and that's the only weight it's given. This is not the correct standard to apply. Leave ignoring this, ignoring the ample country conditions evidence. The key inquiry is the threat of future torture against my client. Mr. Gonzalez-Mejia faces a real, particularized threat of death. His threat is specific. As his uncle has stated, he will mutilate him, murder him, and throw him in a river. This is a specific, real threat of violence. And importantly, this court recently held in Xochihuahemez v. Barr that the threat of future torture is more likely than not to occur when threats of violence come from gang-affiliated family members. That is exactly what's happening here. His uncle, a leader in MS-13, has threatened his life on multiple occasions and has renewed that threat every time he asks about my client's whereabouts when it seems he'll be back within his grasp. His uncle's promise of violence demonstrates this very clear threat of future torture. And this evidence should be considered under the Convention Against Torture. The BIA has an obligation to assess all of the relevant evidence and facts before it. Here, they fail to do so. As such, Petitioner respectfully requests a remand to the BIA. And I'll reserve my remaining time on rebuttal. Thank you. May it please the Court, Matthew George for the Attorney General. I'd like to first lay out the procedural posture of how the particularly serious crime was considered by the agency. And that may shed some light on the agency's consideration of the evidence. The Department of Homeland Security filed a motion to reopen with the board and included the criminal records that were available at that time. The board reviewed the motion, considered both the elements of the conviction at that time, the sentence, and the evidence that was in the criminal records. It concluded that the new conviction was a particularly serious crime. It terminated the previous grant of withholding of removal, and then it remanded the case back to the immigration judge for consideration of the cat deferral claim. And the immigration judge at first seemed to recognize that posture of that the cat deferral was the only issue. I think at least twice the immigration judge does say that. However, the immigration judge then took testimony on the particularly serious crime issue. And that's where this evidence comes in for the first time. Before the board, Petitioner never responded to the motion. He did suggest or make an argument that he never received the motion. However, the board resolved that and said that he did receive notice of it. So he never provided the information that he later provided to the immigration judge. He never provided that to the board in the first instance. The only time it comes up is before the immigration judge, who really shouldn't have been considering the issue because the board had already addressed it. But the immigration judge decided to take testimony on it to look into the evidence. The immigration judge then conducts his own analysis, again, looks at the elements of the conviction, looks at the sentence, determined that that brings it within the ambit of particularly serious crimes. The immigration judge, like the board, then looks at all of the evidence that's now available regarding the facts and circumstances of the conviction. The immigration judge notes that there was a discrepancy between what the records themselves say and then what Petitioner is testifying to. And Petitioner didn't have, as the immigration judge found, didn't have a good explanation for that discrepancy. And in a way, it reflects the first time that Petitioner was convicted of this almost, if not the same crime, a very similar crime, where Petitioner's version of events was very similar to the victim statements and the other criminal records show. Regardless, the immigration judge said, even under Petitioner's version of events, this is a particularly serious crime. It's undisputed that Petitioner struck the victim at least once and that the victim had to go to the hospital and had some pretty significant injuries. Petitioner himself admitted in the testimony before the immigration judge that he knew better. He should have just called the police and not taken things into his own hands. Regardless, the weighing of the evidence is not the issue that the court looks at. What the court is looking at is, did the agency look at the right things in making that determination? It's really more just an analysis of the analysis. And both the board and the immigration judge in this case did exactly what the court has said they're supposed to do. They looked at the elements. They looked at the sentence. They looked at the facts and circumstances and they reached their conclusion. How to weigh all of those facts and circumstances, how to weigh this discrepancy between what Petitioner is saying and what the criminal records are saying, that's completely up to the agency and the court has said it doesn't have jurisdiction to get into that level of weighing evidence and determining who's right and who's wrong. In any event, the immigration judge said, even under Petitioner's version of events, this is a particularly serious crime. Then when it goes back to the board, if you look at the board brief that Petitioner filed, he never raises these issues that he's now raising to the board of, well, I wanted the agency to consider the low end of the sentence or the two years versus a three or four. Or I want the agency to take a bigger look at what I said versus what the criminal records said. He just kind of generally says that I had this contrary narrative, I guess, with respect to the criminal documents. And now when the board resolves the issue or resolves the appeal, it's looking back and saying, look, we've already decided this issue. That was the whole point of the motion to reopen decision. So we're going to just view your argument in the due process context and find that you haven't shown prejudice at bottom. You haven't shown prejudice. You haven't shown us any reason to disturb our prior decision where we resolve this issue in the motion to reopen. So that's really where we are. The agency has decided this issue twice. It's done exactly what the court has directed it to do. It's looked at the elements, it's looked at the sentence, it's looked at the facts and gone on to weigh all that and come up with a conclusion. That's all it's required to do. Turning to the CAD deferral decision, the agency looked at all of the facts and circumstances. It said, look, there's a lot of evidence of just general torture in El Salvador. And that would be true probably in any Salvadoran case where there's this general level of background crime and violence and torture. And as unfortunate as that is, the court has said in many different cases, Alfonso's is one, Wakari is another, where this sort of general fear of harm is not enough for the CAT eligibility. So can I interrupt you there? So this isn't really just general, right, because he has this uncle who is making threats. And part of the agency's reasoning was even if the uncle were to kill him or torture him, we don't think the government would acquiesce because the government has taken steps to improve the rights of LGBT people. I'd like to ask about this improvement concept and see if it's really supported by the record, because it seems like in the record at AR 153, there's a United Nations report from 2018 that states there's almost 100 percent impunity covering the killings of LGBTQI individuals in El Salvador. And I'm not sure what you've pointed to since that statement that says it's improved since 2018, or do you dispute that that was true in 2018? How do you deal with that? All I can really do is point to what the agency has pointed out and that there is some general improvement. I know it's not maybe as great as we would like it to be. It may be only marginal. Is any of that improvement since 2018? I don't remember the exact dates, Your Honor, I don't have that in front of me. I know that if you look at the evidence in the record, the number of if you look at the picture, it was approximately 23 murders in one year. That was on AR 1114. And then a different article said that there were 85 murders. He has this specific uncle who is maybe going to kill him. And so then the question, if we think that the uncle is going to kill him, the question is, is the government going to acquiesce? And if the government if there's 100 percent impunity, it seems like the government is going to acquiesce. What's what's wrong with that reasoning? Well, Your Honor, there's three different there's three different parts of that. There's the general point of compelling evidence that the uncle is this sort of chain of events of that the uncle has expressed the desire to kill him. Now, that is, as Your Honor pointed out, that's the explicit threat now was in 2013. So that's now almost approximately 10 years ago. And the the most recent contact or sort of interest was in 2019, which itself was two years before the hearing is now what, four years ago. So passage of time certainly is one factor that comes into play. Another issue is where is the evidence in the record showing like, yes, we have a threat from this individual. Where is the compelling evidence that this individual has the the authority and the ability to carry out that threat? Well, don't we have evidence of that? I mean, he bragged about killing other people. He's in this notorious gang. Is there any doubt that he has the ability to carry out this threat? Well, where's the where's the evidence that he's going to seek out the petitioner anywhere in in El Salvador that would compel? I mean, there's certainly evidence that a fact finder could reach that finding. The issue is now we need evidence that it's going to compel a fact finder or compel the agency to reach that conclusion. So we do have a threat. We do have a little bit of evidence that he's a shot caller, which as far as I can tell, just means he's an older gang member. But where is compelling evidence that he either has the means, the ability or whatever to himself seek out an individual anywhere in El Salvador to kill that individual or can send out an order or or do something of that nature such that it will result in petitioner's torture? That that evidentiary gap is present in the record. Now, we do have the threat and we do have a claim that it will result in torture. But bridging that gap, where's the compelling evidence that shows whatever steps are necessary to cross that gap or would compel a fact finder to reach all of that? In this case, it's that that evidence isn't there. Now, maybe there's evidence that he said that he's killed people before, but that doesn't mean I mean, what was the date on that? How long ago was that? And does he still have that ability? Every year he's getting older, he may he may lose influence. Who knows where's where's compelling evidence that he has the ability and will exercise that ability? In addition, there's the the matter of relocation. Yes, there's a general countrywide sort of danger, but that's that's faced generally by anyone in El Salvador because of gangs. There is even if there's a heightened risk being in the LGBT community, that's still a general or generic risk. Now, regarding the uncle, the petitioner testified he doesn't even know where the uncle lives in El Salvador, much less that this uncle has this ability to hunt him down. Should he live in a different city or even if he lives in the capital city? We don't even know where where the uncle is, much less that he has the ability to to hunt down a particular individual in El Salvador. So without that compelling evidence, the. So the the the court cannot overturn what the agency has concluded here is that there is no particularized threat, the the relocation issue resolves that now getting into the acquiescence, perhaps the evidence isn't quite as strong, but there is evidence that El Salvador has taken some steps to to protect LGBT. T individuals and and I do remember I don't have a page number right now, there is evidence in the record that said El Salvador has increased the penalties for harming LGBT individuals. There's there's evidence that the police officers who harmed a transgender man have have been prosecuted. And so, yes, these are small steps, but they are steps that El Salvador is taking to the evidence in the record that shows the number of murders of LGBT individuals. That's the highest number I could see was a twenty three or twenty five murders in a year. I couldn't find any evidence in the record of what the population of LGBT individuals is in El Salvador. And so there's no way to tell. Is that a large number of individuals or is this is this just a small number of individuals that are harmed each year? Twenty twenty three murders in a year. I mean, that that could just be similar to a violent city in the United States. I'm sure there are plenty of cities we have that have more than that or well more than that number of murders in a year. So to say that this community is experiencing that many that many without a without a broader context of this, is this most or all of the entire community or a significant number? You know, El Salvador has a population of six and a half million people. So even if maybe only one percent of them are in the LGBT community, I mean, that's sixty thousand or sixty five thousand people. And looking at twenty three to twenty five murders a year, that's not really compelling evidence that any particular individual is going to be. Is going to be tortured and for the same reasons that she's looking at general crime and violence and gang violence and all that kind of things, which petition would also be subject to as someone in El Salvador, the LGBT community is just a smaller subset of the general population. The court has said over and over that. That's impersonal. In particular, evidence doesn't meet the cat standard, and that's all that that really is here. Yes, there is the particularized information regarding the uncle, but then that's where the relocation comes in. That's where the modest, I would say, evidence of of improvement does come in. I know it's small, but it is there. And so for those reasons, the court should deny the petition. You have time for rebuttal. Just a few points on rebuttal, your honors, first, the government maintains a circular argument regarding the BIA and IJ's review of evidence, essentially argue the IJ and BIA said they looked at all the evidence and therefore all of the evidence has actually been analyzed. Looking at the IJ's opinion right here, the IJ dedicates three sentences of analysis, with its conclusion being that based on the violent nature of the assault, the felonious nature present in actual elements of the crime, and then the significant sentence imposed, which, as we've discussed, was the lowest sentence. The IJ therefore determined that the crime was particularly serious. The IJ did not go through and weigh the evidence, all of the relevant evidence, and the BIA merely adopted the IJ's opinion. Second, the government asks, where's the evidence of this threat? Where is the evidence that his uncle Hector will actually harm him? The record is rife with this evidence. His uncle threatened him specifically with the threat of mutilation in 2011 or 2012. That is backed up by the testimony from his father, stating that as soon as he steps foot in El Salvador, his uncle will butcher him. That is further backed up by the testimony from his mother, who also states that she is terrified of her son being deported to El Salvador based on the threat. It is further bolstered by my client's own testimony that he has family members, both in the United States and in El Salvador, who keep tabs on him and who report back to Hector. And it is further evinced by Hector himself, who repeats these threats, who continually checks up when he believes my client will be within his reach. And third, toothless legislation that El Salvador has recently passed does not evince steps of improvement. Indeed, the government points to a recent win where a trans individual was murdered by the police, but the police were prosecuted. It's important to note the police were the ones that murdered the trans individual. And further, he points to murders per year is roughly around 23 based on certain country reports. Those are only reported murders. As the record is also rife with, a lot of individuals will not come forward if a family member has been murdered based on their status in the LGBT community because the LGBT community is so ostracized and persecuted in the community. Therefore, again, the petitioner respectfully requests that this case is remanded. Thank you, Your Honors. Thank you, both sides, for the helpful arguments, and we want to thank you for participating in the pro bono program. Your advocacy is very helpful to the court. Thank you so much.
judges: FRIEDLAND, NELSON, Cardone